IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

EAST CENTRAL COMMUNITY COLLEGE                      PLAINTIFF

v.                                        CIVIL ACTION NO.: **3:25-cv-280-HTW-LGI**

UNITED STATES OF AMERICA                             DEFENDANT

## COMPLAINT

EAST CENTRAL COMMUNITY COLLEGE ("East Central") brings this action against the United States pursuant to 26 U.S.C. § 7422, for a refund of internal revenue taxes totaling $4,481,640.32 (plus interest) owed to it (the "ERC refunds") – and wrongfully denied by the Internal Revenue Service ("IRS") – as Employee Retention Credits ("ERC") [1]. Under the Coronavirus Aid, Relief, and Economic Security Act, PL 116-136, March 27, 2020, 134 Stat 281 ("CARES Act") and Internal Revenue Code § 3134, which created the ERC, Plaintiff is entitled to ERC refunds for the tax periods ending March 31, 2021 ("Q1 2021"), June 30, 2021 ("Q2 2021"), and September 30, 2021 ("Q3 2021").

### NATURE OF ACTION

1. Plaintiff files this civil action under I.R.C. § 7422 for the recovery of employment taxes, including the refundable excess credit (together with statutory interest and any appropriate attorney fees), authorized to be paid to Plaintiff under I.R.C. § 3134 and the CARES Act, but wrongfully denied by the IRS. This Complaint is proper under 28 U.S.C. § 2401 and under I.R.C. §§ 6532 and 7422, as Plaintiff's Q1 2021 ERC claim was denied less than two years ago, and the college's remaining ERC claims for Q2 and Q3 2021 were duly filed with the IRS more than 6

---

[1] Employee Retention Credits or ERC are also interchangeably referred to as Employee Retention Tax Credits or ERTC.

1

months prior to the filing of this Complaint.[2]  On February 4, 2025, the IRS wrongfully denied Plaintiff East Central's Q1 2021 ERC claim. Meanwhile, for nearly three years, the IRS has ignored the college's ERC claims for Q2 and Q3 2021. For the Q1 2021 denied claim, the IRS found there were no governmental orders in place after June 2020 which impacted the college's ability to educate students.[3] In making this determination, the IRS dismissed entirely a multitude of governmental orders imposed on the college which effected every facet of the college's operations. These directives ranged from isolation and social distancing orders to cleaning protocols and impacted everything from the way the college recruited and educated students, to the acquisition of supplies to the staffing of the college. Plaintiff East Central brings this lawsuit to recover the ERC funds due to it but withheld by the IRS despite the college's qualification for these COVID related funds.

## PARTIES

2.      Plaintiff East Central Community College, located in Newton County, Mississippi, offers college educational services to students from Mississippi and beyond. Plaintiff's principal place of business is in Newton County, Mississippi.

3.      The Defendant is the United States of America.

## JURISDICTION AND VENUE

4.      Jurisdiction in this Court is proper under 28 U.S.C. §§ 1331, 1340, and 1346(a)(1), and under 26 U.S.C. (I.R.C.) § 7422.

5.      Venue in this Court is proper under 28 U.S.C. § 1402(a)(2) and 1391(e)(1), as Plaintiff's principal place of business is located in this judicial district.

---

[2] See Exhibit "A"- Plaintiff's 941X for Q1 2021, Q2 2021, and Q3 202, and Form 2848 Power of Attorney that was attached to each 941X.
[3] See Exhibit "B" – IRS Disallowance letter.

6. This Complaint is timely under 28 U.S.C. § 2401(a) and under I.R.C. §§ 6532(a)(1) and 7422(a) because Plaintiff duly filed claims for its Q2 and Q3 2021 ERC refunds with the Secretary more than six months prior to the date of filing this Complaint, and its claim for Q1 2021 ERC funds was denied less than two years ago.

### THE EMPLOYEE RETENTION CREDIT

7. Beginning in 2020, the COVID-19 virus created a global pandemic that swept through all fifty states and resulted in governmental orders to address the pandemic that disrupted the United States' local and national economies. Those orders formed a nexus of federal, state, and local government mandates that created a comprehensive regulatory scheme limiting commerce, travel, and group meetings with the objective to limit the spread of COVID- 19. The governmental response to that public health emergency involved historically unprecedented measures, including lock down orders, social distancing mandates, and forced business closures. The economic effects of those policies were profound. Deemed the "greatest threat to prosperity and well-being the US has encountered since the Great Depression[,]" the estimated cumulative financial costs of COVID-19 were forecast at $16 trillion.[4]

8. In response to the COVID-19 pandemic, the federal government enacted sweeping economic measures to assist American businesses and citizens, including the CARES Act, enacted in March 2020. Section 2301 of the CARES Act created the ERC.[5]

9. The ERC is a broad-based, fully refundable tax credit designed to stimulate economic recovery, support job retention, encourage business sustainability, and mitigate the

---

[4] Alvin Powell, *What might COVID cost the U.S.? Try $16 trillion*, The HARVARD GAZETTE, Nov. 10, 2020. https://news.harvard.edu/gazette/story/2020/11/what-might-covid-cost-the-u-s-experts-eye-16-trillion/.

[5] Coronavirus Aid, Relief, and Economic Security Act (CARES Act), Pub. L. No. 116-136, §2301, 134 Stat 281 (March 27, 2020).

3

impacts on U.S. businesses from the unprecedented challenges posed by the pandemic. Congress intended for the credit to be broadly applicable to help businesses survive a historic pandemic that disrupted the global economy. The credit is available to certain eligible employers for the last three quarters of 2020 and for the first three quarters of 2021.

10. The ERC is a payroll tax credit available to certain employers who qualify under the CARES Act. Employers file an amended quarterly payroll tax return (a 941X) with the IRS to claim the ERC credit.

### Threshold Requirement – 3 Ways to Qualify for an ERC

11. An employer is eligible to claim an ERC if it carried on a trade or business during the quarter at issue and satisfies one of three prongs for eligibility: (1) significant declining gross receipts; (2) full or partial suspension of operations due to government orders, or (3) recovery startup business[6]. CARES Act § 2301(c)(2); I.R.C. § 3134(c)(2).[7]

### The Suspension Test

12. Under the second prong for determining eligibility, an employer is eligible to claim ERC credits if "the operation of [Plaintiff's] trade or business [was] fully or partially suspended . . . due to orders from an appropriate governmental authority limiting commerce, travel, or group meetings (for commercial, social, religious, or other purposes) due to the coronavirus disease 2019 (COVID-19)." I.R.C. § 3134(c)(2)(A)(ii)(I). East Central clearly meets this prong.

13. Eligibility under the "suspension test" under the CARES Act § 2301(c)(2) or I.R.C.

---

[6] Plaintiff is not a "recovery startup business" as defined under I.R.C.§3134(c)(2)(A)(ii)(III), and so it does not claim ERC credits thereunder, nor does it claim the credit under the significant decline in gross receipts prong.

[7] The current version of I.R.C. § 3134 became effective on November 15, 2021, and, as relevant here, is identical to the version of I.R.C. § 3134 in effect from March 11, 2021, to November 14, 2021, and to the version of the CARES Act in effect from January 1, 2021, to March 10, 2021. For ease of reference, this Complaint cites I.R.C. § 3134 when discussing 2021 ERC requirements.

4

§ 3134(c)(2)(A)(ii)(I) contains no financial element whatsoever.

14.     The CARES Act § 2301(c)(2) and I.R.C. § 3134(c)(2)(A)(ii)(I) do not require eligible employers to have suffered any decline in gross receipts at all in order to qualify for ERC credits using the suspension test. Importantly, the suspension test does not even require an employer's business to shut down completely at any point at all during the pandemic.

15.     In fact, IRS Notice 2021-20 provides guidance to the taxpayer that interprets a partial suspension to occur if the employer's operations continue but "are subject to modification due to a governmental order (for example, to satisfy distancing requirements), [then] such a modification of operations is considered to be a partial suspension of business operations due to a governmental order if the modification required by the governmental order has more than a nominal effect on the business operations under the facts and circumstances." *Guidance on the Employee Retention Credit under Section 2301 of the Coronavirus Aid, Relief, and Economic Security Act* IRS Notice 2021-20 *(Answer 17)*.

16.     East Central meets the criteria for the suspension test. East Central Community College was impacted in its operations in multiple areas, including daily administrative and site operations, staffing, recruiting potential students, educating the students that did enroll and the acquisition of integral supplies. Each of these critical functions is interconnected and affects the overall operational efficiency and productivity of the business. The cumulative effect of governmental orders resulted in a partial shutdown of East Central Community College with a more than nominal reduction in the college's ability to provide goods or services in its normal course of business.

**The ERC Generally**

17.     Employers who qualify for the ERC for the first three quarters of 2021 may receive

a credit of up to $7,000 per employee for each quarter in which they qualify. Consolidated Appropriations Act of 2020 (CAA), Pub. L. No. 116-260, §207(b).

18.    The amount of ERC is not limited to the amount of employment taxes the employer paid, and against which the credit is applied. Rather, if the amount of the credit exceeds the applicable employment taxes for the calendar quarter, "such excess shall be treated as an overpayment that shall be refunded under sections 6402(a) and 6413(b)." CARES Act § 2301(b)(3); I.R.C. § 3134(b)(3).

## EAST CENTRAL COMMUNITY COLLEGE

19.    East Central Community College is a 2-year community college located in Decatur, Mississippi, serving 5 county districts. ECCC offers 2-year degrees in 17 major academic concentrations. ECCC also provides 23 terminal degree programs in Healthcare and/or Career and Technical Education, as well as certificates and training in numerous areas through its workforce development program on the Decatur campus, as well as its centers in Carthage, Choctaw, Forest, and Louisville. Currently, ECCC's 9 residence facilities offer more than 700 beds for on-campus living. The College also fields 10 varsity sports teams, including baseball, men's and women's basketball, football, men's golf, men's and women's soccer, softball, and men's and women's tennis.

20.    For ECCC, operational disruptions as a result of social distancing mandates, isolation and quarantining protocols and capacity limitations were present for 2020 and for the period of January 1, 2021, through at least September 30, 2021, pursuant to various consecutively issued executive orders, starting with Executive Order 1460 on March 19, 2020, and continuing through the end of 2021.

21.    These restrictions impacted ECCC's operations dramatically. ECCC was initially

forced to close and shift employees to remote operations in March of 2020, which involved significant training, technology adaptation, and process changes. The migration of courses to a distance learning platform resulted in a reduction in enrollment that continued to impact the university into the 2020-2021 enrollment period.

22. The subsequent closure of student residence halls and dining facilities, as well as social distancing accommodations, further affected College revenues. Once ECCC was able to resume in-person operations, it was subject to capacity restrictions and social distancing protocols, effectively reducing class sizes, which negatively impacted the productivity of academic personnel. The percentage of academic staff affected by these restrictions was at least 42% of all full-time employees.

23. ECCC was also forced to implement stringent social distancing, hygiene, masking, and sanitizing standards that created operational inefficiencies during the period in question.

24. Operational disruptions as a result of quarantine and isolation protocols were present for 2020 and for the period of January 1, 2021, through the end of 2021 pursuant to various consecutively issued orders. These orders started with Executive Order 1463 on March 24, 2020, and continued with CDC rules and MSDH orders including the mandatory MSDH COVID-19 Public Health Guidance for College and University Settings on August 4, 2021, and further orders of MSDH throughout 2020 and 2021. For example, on August 20, 2021, MSDH reiterated a failure to follow isolation and quarantine orders was a crime punishable by fines and jail time. Additionally, the college issued its own COVID related internal orders which impacted its operations, all as more fully set forth below.

25. These restrictions impacted ECCC in the following ways: Employees or students who were exposed to or contracted the virus were required to isolate/quarantine for extended

7

periods, significantly disrupting the educational process and other staffing functions. Mandatory contact tracing procedures and accommodations for infected students and personnel affected the productivity and organizational focus of institutional support staff and full-time employees.

26.     Operational disruptions as a result of gathering restrictions were present for 2020 and the period of January 1, 2021, to September 30, 2021, pursuant to various consecutively issued executive orders, starting with Executive Order 1460 on March 19, 2020, and continuing through 2021 with the college following its own orders, orders from MSDH as well as CDC guidelines.

27.     These restrictions impacted ECCC in the following ways: Limitations on gatherings throughout 2020 and continuing in 2021 significantly impacted the recruitment activities of ECCC. ECCC was unable to conduct in-person campus visits with prospective students and was unable to visit and participate in high school campus events and career fairs to fully recruit and enroll each class for the upcoming fall and spring semesters.

28.     As a result of the restrictions on these recruitment efforts, ECCC experienced a decline in student enrollment. The inability of the university to fully recruit in the Spring and Fall of 2020 led to a 19.7% reduction in enrollment of full-time first-time degree-seeking students for the period in question. Similarly, the restrictions in place during 2020 and 2021 led to a 23.1% reduction in the enrollment of full-time first-time degree-seeking students for the 2021-2022 academic year.

29.     The number of full-time employees affected by limitations on recruitment activities by governmental orders totaled at least 42% of the College's total workforce.

30.     Athletic events and auxiliary programs were concomitantly impacted in 2021 as events were either canceled or restricted in capacity. In addition to lost ticket sales, ECCC was forced to rent additional buses and make additional transportation accommodations for each off-

site sporting activity in the event of athlete or staff illness.

31.  The number of athletic and auxiliary personnel affected by these restrictions was significant.

32.  In addition to the state and national orders referenced above, pursuant to Mississippi Code Ann. § 37-4-1, the college operates as an "agency of local government." And pursuant to Mississippi Code Ann. §37-29-63 the President of the College is the "general manager" of the college and the "custodian" of the property of the college and charged with overseeing all "fiscal and administrative affairs" of the college. By statute, the college president has the statutory authority to arrange courses of study and fix schedules and establish the rules of the college. In other words, the college president (and the Board of Trustees) is the governing authority of this agency of local government.

33.  Throughout 2021, the President of ECCC established rules within the college which were governmental orders, and which caused or contributed to the partial suspension of operations of the college.

34.  By its own internal governmental orders, the campus was partially suspended in its operations by its protocols of 2020 and 2021. Campus COVID-related governmental orders included mandates related to staffing, social distancing, sanitation, quarantining and education.

35.  Finally, supply chain disruptions in the manufacturing and freight transportation sectors of the economy, including operational restrictions, shutdowns, volatile cargo demand, lack of necessary components, and labor shortages related to outbreaks, were the direct result of governmental orders issued to address COVID-19, which led to logistical delays and product shortages for ECCC's suppliers.

36.  These disruptions impacted ECCC in the following ways: ECCC experienced

difficulties obtaining products and materials such as technology and virtual learning equipment, devices and other instructional aids, and other essential items necessary to make classrooms, residential facilities, and administrative offices usable; construction projects including a campus-wide parking lot and Band Hall addition, were delayed due to the inability of contractors to timely obtain the necessary materials to continue work from suppliers across the construction industry.

37. ECCC manages a physical plant consisting of 150 acres with over 30 instructional and service buildings, residence halls, athletic facilities/fields, and faculty houses. Facility maintenance and repair work for residential and learning facilities was also delayed as HVAC equipment and electrical supplies were widely unavailable. Supply chain disruptions increased order fulfillment times from immediate availability to weeks or months. Significant supply chain disruptions continued through the Spring of 2022. The restrictions that prevented the timely completion of projects impacted a significant percentage of staff during the period in question. The aggregate effect of these disruptions brought about through the effect of orders from appropriate governmental authorities, resulted in a 10% or more reduction in ECCC's ability to provide services in its normal course of business, therefore constituting a partial suspension of its operations entitling ECCC to claim the Employee Retention Credit.

38. Under the Coronavirus Aid, Relief, and Economic Security Act, PL 116-136, March 27, 2020, 134 Stat 281 (CARES Act) and section 3134 of the Internal Revenue Code (I.R.C.), Plaintiff ECCC is entitled to the Employee Retention Credits (ERC) described in this Complaint because ECCC meets the partial-suspension test for the first, second and third quarters of 2021.

39. Restrictions due to government orders from an appropriate governmental authority had the effect of both fully and partially shutting down ECCC and had a greater than nominal

impact on ECCC's productivity, revenue and operations.

40. Because ECCC's operations were partially suspended due to government orders that meet the statutory criteria for the claimed quarters in 2021, ECCC is entitled to its claimed ERC, plus interest, attorney fees and costs.

### First Quarter 2021

41. On or about June 13, 2022, Plaintiff duly filed a Form 941-X, *Adjusted Employers Quarterly Federal Tax Return or Claim for Refund*, claiming the ERC for Q1 2021. ("Q1 2021 Form 941-X").

42. Line 18a of the Q1 2021 Form 941-X reported that Plaintiff's nonrefundable portion of ERC was $158,369.64.

43. Line 26a of the Q1 2021 Form 941-X reported that Plaintiff's refundable portion of ERC was $1,302,347.96.

44. Line 30 of the Q1 2021 Form 941-X reported $2,086,739.43 in qualified wages for the ERC.

45. Based upon the foregoing, Plaintiff timely claimed an ERC for Q1 2021 in the amount of $1,460,717.60.

46. The IRS has issued a Statutory Notice of Claim Disallowance for Q1 2021. (Exhibit "B")

### Second Quarter 2021

47. On or about June 13, 2022, Plaintiff duly filed a Form 941-X, *Adjusted Employers Quarterly Federal Tax Return or Claim for Refund*, claiming the ERC for Q2 2021. ("Q2 2021 Form 941-X").

48. Line 18a of the Q2 2021 Form 941-X reported that Plaintiff's nonrefundable

11

portion of ERC was $173,826.82.

49. Line 26a of the Q2 2021 Form 941-X reported that Plaintiff's refundable portion of ERC was $1,359,174.94.

50. Line 30 of the Q2 2021 Form 941-X reported $2,190,002.51 in qualified wages for the ERC6.

51. Based upon the foregoing, Plaintiff timely claimed an ERC for Q2 2021 in the amount of $1,533,001.76

52. The IRS has not issued the ERC or a Statutory Notice of Claim Disallowance for Q2 2021.

### Third Quarter 2021

53. On or about June 13, 2022, Plaintiff duly filed a Form 941-X, *Adjusted Employers Quarterly Federal Tax Return or Claim for Refund*, claiming the ERC for Q3 2021. ("Q1 2021 Form 941-X").

54. Line 18a of the Q3 2021 Form 941-X reported that Plaintiff's nonrefundable portion of ERC was $38,727.95.

55. Line 26a of the Q3 2021 Form 941-X reported that Plaintiff's refundable portion of ERC was $1,449,193.01.

56. Line 30 of the Q3 2021 Form 941-X reported $2,125,601.30 in qualified wages for the ERC.

57. Based upon the foregoing, Plaintiff timely claimed an ERC for Q3 2021 in the amount of $1,487,920.96.

58. The IRS has not issued the ERC or a Statutory Notice of Claim Disallowance for Q3 2021.

## CAUSES OF ACTION

59. Pursuant to I.R.C. § 7422, a taxpayer may file a civil action against the United States for the recovery of taxes after a claim for refund has been filed with the Secretary.

60. Pursuant to I.R.C. § 6532, no suit for refund shall begin (a) prior to the expiration of six months from the date of filing the claim for refund, or (b) after the expiration of two years from the date the Secretary notifies the taxpayer that its claim has been disallowed.

61. Plaintiff satisfies each of these requirements.

62. Plaintiff qualified for the ERC for Q1 2021, Q2 2021, and Q3 2021 under the suspension test and meets the IRS "safe harbor" requirements for eligibility to receive ERC for those quarters.

63. The IRS has not paid Plaintiff's ERC claims for Q1 2021, Q2 2021, or Q3 2021.

64. On February 4, 2025, the IRS wrongfully denied East Central's Q1 2021 claim.

65. The IRS has ignored Plaintiff's Q2 and Q3 2021 claims and these claims have been pending for more than six months.

66. Plaintiff is entitled to the full amount of ERC claimed, together with interests pursuant to I.R.C. § 6611, as well as reasonable attorney fees and legal costs associated with this cause of action, pursuant to 28 U.S.C § 2412 and/or I.R.C. § 7430.

**Count One**
**Q1 2021 Refund Claim**

67. Plaintiff repeats, realleges, and incorporates by reference herein all preceding paragraphs as though fully set forth herein.

68. Plaintiff is an eligible employer qualified to receive $1,460,717.60 of ERC in Q1 2021.

69. On or about June 13, 2022, Plaintiff duly filed a Form 941-X claiming an ERC for

Q1 2021 in the amount of $1,460,717.60. This claim was wrongfully denied by the IRS.

70.     Accordingly, Plaintiff is entitled to a refund of ERC in the amount of $1,460,717.60, along with statutory interest.

**Count Two**
**Q2 2021 Refund Claim**

71.     Plaintiff repeats, realleges, and incorporates by reference herein all preceding paragraphs as though fully set forth herein.

72.     Plaintiff is an eligible employer qualified to receive $1,533,001.76 of ERC in Q2 2021.

73.     On or about June 13, 2022, Plaintiff duly filed a Form 941-X claiming an ERC for Q2 2021 in the amount of $1,533,001.76.

74.     Accordingly, Plaintiff is entitled to a refund of ERC in the amount of $1,533,001.76, along with statutory interest.

**Count Three**
**Q3 2021 Refund Claim**

75.     Plaintiff repeats, realleges, and incorporates by reference herein all preceding paragraphs as though fully set forth herein.

76.     Plaintiff is an eligible employer qualified to receive $1,487,920.96. of ERC in Q3 2021.

77.     On or about June 13, 2022, Plaintiff duly filed a Form 941-X claiming an ERC for Q3 2021 in the amount of $1,487,920.96.

78.     Accordingly, Plaintiff is entitled to a refund of ERC in the amount of $1,487,920.96. along with statutory interest.

**Count Four**
**Attorney Fees and Administrative Costs**

14

79. Plaintiff repeats, realleges, and incorporates by reference herein all preceding paragraphs as though fully set forth herein.

80. In addition to its refund and statutory interest, Plaintiff is also entitled to its administrative costs, including attorneys' fees.

81. The Defendant must pay reasonable litigation and administrative costs to a prevailing party unless its position in the proceeding was "substantially justified." I.R.C. § 7430(c)(4)(B).

82. Here, the Defendant's position was not substantially justified. Indeed, the IRS ignored the college's proof and wrongfully denied its claim for Q1 2021 and has taken no action on Q2 and Q3 2021. Meanwhile, the IRS has paid claims made by other similarly situated businesses, including educational institutions, for these same quarters denied/ignored.

83. In failing to pay Plaintiff's 2021 ERC claims that were objectively due based upon the full or partial suspension of Plaintiff's operations as provided for in the clear language under I.R.C. § 3134, and for the 2021 quarters claimed, under the suspension test, the Defendant's position was not substantially justified.

84. Plaintiff's entitlement to the ERCs at issue is straightforward. The Defendant's refusal to promptly pay the ERC refund now past due is, therefore, not substantially justified.

## JURY TRIAL DEMAND

Plaintiff demands a jury trial on all issues so triable.

## PRAYER FOR RELIEF

Wherefore, Plaintiff respectfully requests that this Court enter a judgment against Defendant, the United States of America, for:

(A) A tax refund for Q1 2021 representing ERC in the amount of $1,460,717.60 with statutory interest thereupon;

(B)  A tax refund for Q2 2021 representing ERC in the amount of $1,533,001.76 with statutory interest thereupon;

(C)  A tax refund for Q3 2021 representing ERC in the amount of $1,487,920.96. with statutory interest thereupon;

(D)  Reasonable litigation and administrative costs, including attorneys' fees, as allowed by law; and

(G)  All other relief as this Court deems necessary.

Respectfully submitted, this the 18th day of April, 2025.

                                **EAST CENTRAL COMMUNITY COLLEGE**

                                */s/* ***Jamie F. Lee***
                                JAMIE F. LEE          (MSB 101881)
                                MATTHEW ANDREWS  (MS BAR 103151)
                                KEITH B. FRANKLIN     (MSB 105376)
                                *Attorneys for EAST CENTRAL COMMUNITY COLLEGE*

OF COUNSEL:

E.J. SAAD LAW FIRM
6207 Cottage Hill Road, Ste. G
Mobile, AL 36609
Phone: (251) 660-0888
Email: jamielee@ejsaadlaw.com
       mandrews@ejsaadlaw.com
       k.franklin@ejsaadlaw.com